774 So.2d 50 (2000)
TRIPLE R PAVING, INC., a Florida corporation, Appellant,
v.
BROWARD COUNTY, a political subdivision of the state of Florida, Appellee.
Frederic R. Harris, Inc., Appellant,
v.
Triple R. Paving, Inc., a Florida corporation, Appellee.
Nos. 4D99-3609, 4D99-3610.
District Court of Appeal of Florida, Fourth District.
October 25, 2000.
Rehearing Denied January 12, 2001.
*52 Joseph W. Lawrence, II and Frederick J. Springer of Vezina, Lawrence & Piscitelli, P.A., Fort Lauderdale, for Appellant/Appellee Triple R Paving, Inc.
David B. Mankuta and Margaret Z. Villella of Atkinson, Diner, Stone, Mankuta & Ploucha, P.A., Hollywood, for Appellant Frederic R. Harris, Inc.
Edward A. Dion, County Attorney; Andrew J. Meyers, Chief Appellate Counsel; and Tamara M. Scrudders, Assistant County Attorney, Fort Lauderdale, for Appellee Broward County.
STONE, J.
Triple R Paving, Inc. ("Triple R"), plaintiff below, and Frederic R. Harris, Inc. ("Harris"), third-party defendant, appeal from a judgment awarding damages to Triple R resulting from construction delays in the performance of its road construction contract with Broward County, Harris' indemnitee. The appeals have been consolidated for review.
Triple R successfully bid on a road construction contract, the design for which was prepared by Harris. The contract called for widening a portion of Rock Island Road, including widening a bridge which spanned a canal. During construction, delays resulted from a horizontal sight distance design flaw, a Florida Power & Light (FP & L) utility relocation, and detention pond elevation problems. Triple R filed suit against Broward County for delay damages, which included lost home office overhead and lost efficiency. The county, in turn, filed a third-party complaint against Harris for indemnification.
The standard form contract, used by the county, contained the following pertinent clauses:
43. No Damages for Delay:

NO CLAIM FOR DAMAGES OR ANY CLAIM OTHER THAN FOR AN EXTENSION OF TIME SHALL BE MADE OR ASSERTED AGAINST THE COUNTY BY REASON OF ANY DELAYS. The CONTRACTOR shall not be entitled to an increase in the Contract Sum or payment or compensation of any kind from the COUNTY for direct, indirect, consequential, impact or other costs, expenses or damages, including but not limited to costs of acceleration or inefficiency, arising because of delay, disruption, interference or hindrance from any cause whatsoever, ...; provided, however, that this provision shall not preclude recovery or damages by the CONTRACTOR for hindrances or delays due solely to fraud, bad faith or active interference on the part of the COUNTY or its agents. Otherwise, the CONTRACTOR shall be entitled only to extensions of the Contract Time as the sole an exclusive remedy for such resulting delay, in accordance with and to the extent specifically provided above.
* * *
45. No Interest:

Any monies not paid by the COUNTY when claimed to be due to the CONTRACTOR under this Contract shall not be subject to interest including prejudgment interest.
During the construction, Triple R determined that it would be more cost efficient to build the bridge with a single span rather than two spans and submitted what is known as a value engineering contract proposal (VECP) to make that change. The county indicated it was interested in pursuing the VECP and asked Triple R to *53 have its engineer design a single span bridge.
Triple R retained engineer Joe Roles to design the single span bridge. He testified that his design of the bridge for the VECP did not change any element of the horizontal geometry, and he did not check horizontal sight distances because his work did not affect them. Both Roles and Hawks, Triple R's president, stated that Harris' representative, John Wise, knew that the plans did not meet horizontal sight distance standards. According to Hawks, John Wise was aware of the problem as early as 1992, but never mentioned throughout the VECP process, or in any meetings regarding the VECP, that the horizontal sight distance should be checked, despite the fact that he agreed to personally check the sight distance against standards at the time the VECP was under discussion for approval.
In September 1994, during construction, it became apparent that the bridge was too close to the Inverrary driveway and Triple R sent a letter to the county advising them of the problem. Broward County then refused to allow the bridge to open in the condition it was in on September 2, 1994. In September 1994, Triple R advised Harris that it would move its manpower and equipment off the job until a solution to the horizontal sight distance problem was discovered; however, it was directed not to do so.
While a solution was being worked out, Triple R worked on a portion of the project north of the bridge, but the inability to open the bridge and switch traffic to the other lane impeded its ability to proceed efficiently with its work.
A second delay occurred once the driveway was completed and construction was to be resumed. Terry Opdyke, Harris' chief inspector for the job, stated from the beginning of the job that he would coordinate all utilities because he wanted to control them. FP & L was scheduled to remove the power lines that went over the existing bridge. Opdyke told Triple R that the utility relocation would take only a matter of hours and that work could be resumed the same day or the next day. Triple R's subcontractor went out to the job, but FP & L did not show up to remove the power lines because of maintenance problems with its equipment. This delay lasted for several days.
The third delay resulted from problems involving the detention pond, as designed by Harris, which was to drain into a canal controlled by the city of Tamarac. The canal's elevation was higher than depicted in the design and higher than the pond; however, no proof was elicited to show that either the county or Harris was aware of this design flaw prior to actual construction. Had the construction proceeded as designed, a backward flow would have resulted. When the problem was recognized, Opdyke was told to ensure that the canal was at a specified elevation; however, when he approached the city of Tamarac to request that it drop the elevation of the canal, the city refused. The detention pond design delay also led to extended performance costs for Triple R.
The entire project was finished in late August of 1995, within the extension period granted for the delays, but not within the original contract period. The work was never completely suspended on the project. According to Triple R, it was never able to become more efficient in performing the remainder of the work.
Although Triple R was paid for all work performed, it claimed damages for inefficiency based on the inability to complete the job in the time originally anticipated. Triple R claimed that during the delays and extended performance period, the company obtained no substitute work to compensate it for lost overhead. Hawks stated that his company did some other work but did not gain any road work.
Harris moved for directed verdict at the close of Triple R's case claiming that section 43 of the contract precluded delay damages inasmuch as Triple R had failed *54 to prove that the construction delays were the result of fraud, bad faith, or active interference. The trial judge reserved ruling.
The trial judge instructed the jury as follows regarding Triple R's claim for lost overhead:
If you find by the greater weight of the evidence that Triple R Paving and/or Murphy Construction are entitled to recover damages due to hindrances or delays, you shall consider the claim of Triple R Paving and Murphy Construction to extended overhead costs as part of Triple R Paving's damages.
Extended overhead costs are additional, unabsorbed administrative and supervisory expenses, including all appropriate allocated portion [sic] of the costs of operating the company's home office for the period of time the company was delayed in completing the project. Triple R Paving shall be entitled to recover extended overhead costs if the greater weight of the evidence shows:
1. A government imposed delay existed on the project;
2. Triple R Paving and/or Murphy Construction was required to stand by and was unable to take on substitute work; and
3. Triple R Paving and Murphy Construction suffered damages because of the inability to take on additional work.
(emphasis added)
The verdict form included special interrogatory number 4, which was answered as indicated:
4. With regard to Triple R. Paving's claim for Home Office Overhead Damages:
(a) Do you find that a government-imposed suspension occurred on the project?
Yes_______ No___X___
(b) Do you find that it was impractical for Triple R. Paving to take on additional work during the government-imposed suspension?
Yes_______ No___X___
(c) Do you find that Triple R. Paving suffered home office overhead damages as a result of delay on the project?
Yes___X____No_______
If your Answer is "yes" to 4(a)(b) & (c) continue to Question No. 5. If your Answer is "no" to 4(a)(b) or (c), proceed to Question No. 6.
(emphasis added)
Triple R objected to the special jury interrogatory in that the wording differed from that of the jury instruction. Its objection was overruled.
The jury returned a verdict which awarded damages to Triple R for loss of efficiency in the amount of $112,929.31, but nothing for home office overhead. The trial judge denied Triple R's motion for pre-judgment interest on the award, finding that it was precluded by section 45 of the contract.
Harris raises several points, only one of which merits discussion: whether the trial court erred in denying its motion for directed verdict as to Triple R's delay damages claim in the face of section 43 of the contract, which prohibits damages for delay absent fraud, bad faith, or active interference.
Clauses providing for "no damages for delay," except in the case of fraud, bad faith, or active interference by the owner, are legal and enforceable. See Newberry Square Dev. Corp. v. Southern Landmark, Inc., 578 So.2d 750 (Fla. 1st DCA 1991); Southern Gulf Util., Inc. v. Boca Ciega Sanitary Dist., 238 So.2d 458 (Fla. 2d DCA 1970); see also McIntire v. Green-Tree Communities, Inc., 318 So.2d 197 (Fla. 2d DCA 1975); Peter Kiewit Sons' Co. v. Iowa S. Util. Co., 355 F.Supp. 376 (S.D.Iowa 1973); Williams Elec. Co. v. Metric Constructors, Inc., 325 S.C. 129, 480 S.E.2d 447 (1997). See generally Susan Sisskind Dunne, "No Damage For Delay" Clauses, CONSTR. LAW, Apr. 1999 at 38.
*55 It is Harris' assertion that, as a matter of law, Triple R failed to establish sufficient proof of either fraud, bad faith, or active interference to overcome the contract prohibition against delay damages. We agree with Harris with respect to the delays occasioned by the FP & L utility relocation and the detention pond elevation. See Southern Gulf Util., 238 So.2d at 458 ("mere lethargy or bureaucratic bungling" would not overcome no damage for delay clause). However, we find that the facts surrounding the delay which resulted from the horizontal sight distance design flaw were sufficient to allow a jury to decide the question of fraud, bad faith, or active interference.
A directed verdict should not be granted unless there is no proper view of the evidence which could sustain a verdict for the non-moving party. See Tesher & Tesher, P.A. v. Rothfield, 392 So.2d 1000 (Fla. 4th DCA 1981). As this court has previously stated:
Presented with such a motion, the court must view all of the evidence in a light most favorable to the non-movant, and, in the face of evidence which is at odds or contradictory, all conflicts must be resolved in favor of the party against whom the motion has been made ... Only where there is no evidence upon which a jury could properly rely in finding for the plaintiff, should a directed verdict be granted.
Stokes v. Ruttger, 610 So.2d 711, 713 (Fla. 4th DCA 1992); see also Houghton v. Bond, 680 So.2d 514, 522 (Fla. 1st DCA 1996).
In Newberry Square, the court recognized that a "no damage for delay" clause would be vitiated by "delays resulting from a party's fraud, concealment, or active interference with performance under the contract." Id. Furthermore, "willful concealment of foreseeable circumstances which impact timely performance" will also limit applicability of a "no damages for delay clause." Id. Active interference was found in Newberry Square where the property owner delayed approving plans and change orders and ordered that construction not proceed absent such orders. Furthermore, the president of the corporation failed to make timely payments required by the contract and had threatened to "break" the contractor before he would pay him. See id.
We recognize that the facts of Newberry Square are more egregious than the circumstances surrounding the horizontal sight distance design flaw which resulted in the first construction delay at issue here; however, evidence of Harris' knowledge of the design flaw and the subsequent failure to apprise Triple R of the problem is sufficient to constitute "willful concealment of foreseeable circumstances which impact timely performance," such that the "no damages for delay" clause may be overcome. See also McIntire, 318 So.2d at 200 ("[C]ircumstances which caused the delay were brought about by appellee and were even foreseen but concealed by appellee when the contract was made.").
It is undisputed that where a public authority does not willfully or knowingly delay job progress, it is protected by a "no damage for delay clause." See C.A. Davis, Inc. v. City of Miami, 400 So.2d 536, 539 (Fla. 3d DCA 1981). In this case, however, the evidence showed a "knowing delay" and silence when assigned the responsibility of verifying compliance with standards on this point.
We note that Black's Law Dictionary 134 (7th ed.1999) defines "bad faith" as "Dishonesty of belief or purpose " and includes the following quotation from the Restatement (Second) of Contracts § 205 cmt. d (1981):
A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: ... interference with or failure to cooperate in the other party's performance.
*56 Black's at 134. The evidence of Harris' knowledge of the plan defect and failure to apprise Triple R of the problem while simultaneously agreeing to check the horizontal sight distance against standards during the VECP approval process is evidence of interference with, or at the very least, "failure to cooperate in the other party's performance," and, therefore, was sufficient proof of bad faith to allow the jury to decide the question of Triple R's entitlement to delay damages.
Decisions of other jurisdictions lend further support to our conclusion. See, e.g., Port Chester Elec. Constr. Corp. v. HBE Corp., 894 F.2d 47 (2d Cir.1990); P.T. & L. Constr. Co. v. New Jersey, Dep't of Transp., 108 N.J. 539, 531 A.2d 1330 (1987); Buckley & Co. v. State of New Jersey, 140 N.J.Super. 289, 356 A.2d 56 (1975). In Port Chester Electrical, the court of appeals premised its holding on the "universally accepted proposition that contract provisions aimed at relieving a party from the consequences of his own fault are not viewed with favor by the courts." Id. at 48 (citations omitted).
In P.T. & L., the court recognized:
When the government makes a positive statement of fact about the character of work to be performed, upon which the contractor may reasonably rely, it is binding on the government notwithstanding the inclusion of exculpatory clauses in the contract.
P.T. & L., 531 A.2d at 1335. Accordingly, the court refused to apply a no damages for delay clause where the watery condition of the construction site caused construction delay after the state had misled the contractor into believing that the conditions of the site would be dry or normal. See id. Similarly, in this case, the evidence adduced by Triple R in its case-in-chief established that Harris was well aware of the design flaw in the bridge construction, but withheld that information from Triple R. Thus, there is sufficient evidence to allow a jury to determine whether fraud, bad faith, or active interference vitiated the no damages for delay clause. See also Buckley; 391 PLI/REAL ESTATE LAW AND PRACTICE COURSE HANDBOOK SERIES, "Defending Against the Contractor's Delay Damages Claim" at 395-97.
Accordingly, we affirm the trial court's denial of Harris' motion for directed verdict on the "no damages for delay" clause with respect to the horizontal sight distance delay. However, in view of the county's and Harris' lack of control over FP & L and the lack of proof of knowledge as to the detention pond flaw, we find the evidence insufficient, as a matter of law, to show fraud, bad faith, or active interference with respect to the FP & L relocation delay and the detention pond delay and, accordingly, reverse and remand for judgment in favor of the county and Harris on those damage claims. As to all other issues raised by Harris, we affirm.
Having concluded that the horizontal sight distance delay damages were not barred by section 43 of the contract, we must address issues raised by Triple R in its appeal. Triple R first asserts that use of the special jury verdict interrogatory regarding home office overhead damages was inconsistent with the jury instruction and thereby misled or confused the jury in its verdict such that a new trial should have been granted. Triple R further contests the trial judge's denial of pre-judgment interest on its award. We reverse on both counts.
At issue is Triple R's claim for home office overhead, or Eichleay[1] damages, and whether the wording of jury verdict interrogatory number 4 misled or confused the jury as to the law regarding imposition of those damages.
Trial courts are accorded broad discretion in their decisions to give a particular *57 jury instruction, and any such decision will not be reversed on appeal absent prejudicial error. See Poole v. Lowell Dunn Co., 573 So.2d 51 (Fla. 3d DCA 1990). However, a confusing or misleading jury instruction may constitute reversible error. See Gross v. Lyons, 721 So.2d 304 (Fla. 4th DCA 1998)(citing Florida Power & Light Co. v. McCollum, 140 So.2d 569 (Fla.1962)), dec. approved, 763 So.2d 276 (Fla.2000). Although use of jury interrogatories is also subject to the trial court's broad discretion, as noted in Firmani v. Grant, 681 So.2d 869, 870 (Fla. 5th DCA 1996), "There is great potential for the jury to be misled into following the verdict form rather than following the jury instruction." Hence, reversal is required where the jury could have been misled or confused by a verdict form which is inconsistent with the jury instructions. See Schlein v. Florida East Coast Ry. Co., 339 So.2d 1142 (Fla. 3d DCA 1976).
The damages at issue are damages which are awarded, pursuant to Eichleay, to a government contractor who suffers "unabsorbed home office overhead when the government delays work on the contract indefinitely but requires the contractor to remain available to resume work immediately on the government's instruction." Satellite Elec. Co. v. Dalton, 105 F.3d 1418, 1419 (Fed.Cir.1997). The rationale for such damages is explained, thusly:
Home office overhead costs are those [costs] that are expended for the benefit of the whole business, which by their nature cannot be attributed or charged to any particular contract. They are fixed costs that are allocated on a prorata basis among various contracts. When the government delays or disrupts contract performance, the contractor's stream of income decreases while the fixed costs allocated to that contract continue. The Eichleay formula "seeks to equitably determine allocation of unabsorbed overhead to allow fair compensation of a contractor for government delay."
105 F.3d at 1421 (internal citations omitted). The Eichleay formula has been approved by this court. See Broward County v. Russell, Inc., 589 So.2d 983 (Fla. 4th DCA 1991).
Entitlement to Eichleay damages depends on proof of three elements:
(1) a government-imposed delay occurred; (2) the government required the contractor to "standby" during the delay; and (3) while "standing by," the contractor was unable to take on additional work.
105 F.3d at 1421; see also Melka Marine, Inc. v. United States, 187 F.3d 1370 (Fed. Cir.1999). Once the contractor proves the first two elements, a prima facie case of entitlement to Eichleay damages is established, the burden of production then shifts to the government "to show either (1) that it was not impractical for the contractor to obtain `replacement work' during the delay, or (2) that the contractor's inability to obtain such work, or to perform it, was not caused by the government's suspension." Melka Marine, 187 F.3d at 1375 (citing West v. All State Boiler, Inc., 146 F.3d 1368, 1376 (Fed.Cir.1998)).
Triple R takes issue with the use of the phrase "government imposed suspension" in the jury interrogatory which it asserts confused or misled the jury in the face of jury instruction number 12 which referred to "government imposed delay." In All State Boiler, the court stated, "The proper standby test focuses on the delay or suspension of contract performance for an uncertain duration, during which a contractor is required to remain ready to perform." Id. at 1373 (emphasis added); see also Interstate Gen. Gov't Contractors, Inc. v. West, 12 F.3d 1053 (Fed.Cir.1993). Hence, the use of "or" implies that either situation satisfies the Eichleay test; therefore, the substitution of one word for the other between the jury instruction and the jury verdict interrogatory would not constitute an incorrect statement of law. Here, however, it was *58 inconsistent with the jury instruction and an incorrect and misleading statement with respect to the facts in this case, given that Triple R never completely suspended operations, but patently suffered delays as a result of the county's and Harris' actions. Moreover, contrary to Harris' assertion, that the contract was completed "on time," the construction problems caused delay such that the contract could not be completed within the original time allotted.
Triple R further argues that use of the term "impractical to take on additional work" in the jury interrogatory conflicts with the jury instruction phrase regarding the second element of the Eichleay test found in paragraph number 2 of the jury instruction, "unable to take on substitute work."[2] In All State Boiler, the court, recognizing the distinction between the ability to take on additional work or the ability to take on replacement work, observed that the "ability to take on, or continue to perform, other work in its normal course of business is irrelevant to the contractor's right to recover unabsorbed overhead expenses...." Id. at 1377. Furthermore, the court stated:
The critical factor, then, is not whether the contractor was able to obtain or continue to work on other or additional projects but rather its ability to obtain a replacement contract to absorb the indirect costs that would otherwise be unabsorbed solely as a result of a government suspension on one contract.
Id. (emphasis added). The terms have distinctly different meanings, and the appropriate term was that used in the jury instruction; therefore, use of the term "additional work" in jury interrogatory 4(b) was an incorrect statement of the law, potentially leading to confusion or misunderstanding.
We conclude from the jury's response to the special interrogatories that it was likely to have been misled by the verdict form. In answering interrogatory number 4, the jury found that there was no government suspension and that it was not impractical for Triple R to take on additional work. Jury instruction number 12 told the jurors that Triple R shall only be entitled to home office overhead damages in the case of government imposed delays and inability to take on substitute work, not "government imposed suspension" and inability to take on "additional" work. Had the jury interrogatory mirrored the instruction, a negative answer to the first two questions would have necessarily led to a negative answer to the third. However, in this case, the jury was obviously confused when it answered the first two questions in the negative, then found that Triple R should be entitled to home office overhead damages.
The jury found that there was no suspension of work, and that Triple R had taken on other jobs during this contract, but those findings were apparently irrelevant to its decision because the first time that the interrogatories mentioned damages for "delay" rather than suspension of work, the jury found that home office overhead damages had been incurred. Significantly, even though the jury concluded that Triple R suffered home office overhead damages, it was unable to award an amount because the interrogatory required the jury to skip that computation if the answer to either of the three preceding sub-parts was "no." The jury apparently concluded that Triple R suffered home office overhead damages as a result of delay on the project, leading to the conclusion that the wording change resulted in jury misunderstanding or confusion. The use of the incorrect wording on the verdict form patently confused the jury, and reversal and re-trial on the home office overhead claim are required, limited to delay occasioned by the horizontal sight distance design flaw and correction.
*59 We further agree that contract section 45 does not preclude the award of pre-judgment interest in this case. Our decision is predicated on interpretation of the contract, which we undertake de novo as a question of law. See Burns v. Barfield, 732 So.2d 1202 (Fla. 4th DCA 1999). Construing the ambiguous terms of the contract strictly against the drafter, the county, see U.S.B. Acquisition Co. v. Stamm, 660 So.2d 1075 (Fla. 4th DCA 1995), we find that the terms prohibiting pre-judgment interest on "monies due under the contract" do not include damages awarded in the case of construction delays. Accordingly, pre-judgment interest is due on any damage award for loss of efficiency and on any damage award on re-trial of the home office overhead claim.
REVERSE AND REMAND for proceedings consistent with this opinion.
KLEIN, J. and OWEN, WILLIAM C., Jr., Senior Judge, concur.
NOTES
[1] Eichleay Corp., A.S.B.C.A. No. 5183, 60-2 B.C.A. (CCH) 2688, 1960 WL 538 (July 29, 1960).
[2] We do not reach the question of whether inconsistent use of the terms "additional work" in paragraph 3 of the jury instruction rendered the instruction erroneous as that point is not before us.